```
              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
                 JACKSONVILLE DIVISION
                        - - -
BRYAN A. HARRISON          : CASE NO.
                           : 3:21-CV-746-BJD-JRK
             Plaintiff,    :
                           :
        V.                 : NO. 20-5928
                           :
ST. JOHNS COUNTY           :
SHERIFF'S OFFICE, ET AL.:
                           :
          Defendants.  :


                    - - -


          Monday, October 17, 2022

                    - - -


        Oral deposition of KENNETH EVERETT,
taken via Zoom Video Communications on the
above date, beginning at approximately
5:15 p.m., before Maria Rousakis,
Professional Court Reporter and Notary
Public.
                    - - -



         DiPIERO COURT REPORTING
      Registered Professional Reporters
      1175 Marlkress Road - Unit 2460
      Cherry Hill, New Jersey  08034
            (215) 735-8101
```

Exhibit 2

KENNETH EVERETT

Page 10

1   employed with?

2   A.    St. Johns County Sheriff's office.

3   Q.    How long were you there?

4   A.    I was there till July 3rd of this

5   year.

6   Q.    Of 2022?

7   A.    Correct.

8   Q.    Okay.  And what positions did you

9   hold with the St. Johns County Sheriff's

10  Office?

11  A.    I was a 911 dispatcher and deputy

12  sheriff.

13  Q.    Okay.  And when did you begin your

14  tenure as the 911 dispatcher?

15  A.    Approximately January 2013 through

16  October 2014, I believe.

17  Q.    Okay.  And then when did you begin

18  your tenure as a deputy sheriff?

19  A.    October 2014 till July 3rd, 2022.

20  Q.    Okay.  And were you assigned to any

21  special units in either of these

22  tenures?

23  A.    Special unit, would field training

24  officer count as --

25  Q.    Yes.

KENNETH EVERETT

Page 12

1   you have any special training required

2   or ordered training that you had to do

3   throughout your time there?

4   **A.    Every year we did our annual**

5   **training which would comprise of**

6   **defensive tactics, vehicle operations**

7   **every two years, taser.  We had to**

8   **qualify with our firearms.**

9   Q.   Okay.  And for these classes and

10  courses, were those -- were there any

11  that you did voluntarily, or any of them

12  may have been mandated based upon

13  sanctions or behaviors at St. Johns

14  County Sheriff's Office?

15              MS. ADKINS:  Objection to

16        form.

17              THE WITNESS:  Not sanctions

18        or behaviors, but I did volunteer

19        for field training officer, radar

20        laser, report writing.  I don't

21        know all my classes.  You've have

22        to look in my file, but those are

23        the ones I can remember.

24  BY MS. WOMBLE:

25  Q.   Okay.  And who generally conducted

KENNETH EVERETT

Page 13

1    these trainings?

2    A.   It would be put through the St.

3    Johns River State College.  A certified

4    instructor would teach you a 40-hour

5    course on it.

6    Q.   Okay.  And aside from these

7    trainings, what is your educational

8    background?

9    A.   Currently?

10   Q.   Up until this point, high school,

11   college, et cetera.  Have you -- did you

12   graduate from high school?  Did you

13   attend college?

14   A.   I graduated from high school, and I

15   have some college.  I'm currently

16   enrolled in college at St. Johns River

17   State College.

18   Q.   Okay.  And when did you begin your

19   college education?

20   A.   Well, I dual enrolled in high

21   school, took a couple classes, I think

22   about six, and I enrolled in college

23   full time last year in January, I

24   believe.

25   Q.   Okay.  And where did you attend

KENNETH EVERETT

Page 16

1  you've been with the sheriff's office,

2  did you have a break in your

3  employment?

4  A.   Not a break, but I was in the

5  military, so I went on two deployments.

6  Q.   Okay.  And what years were you in

7  the military?

8  A.   2015 to 2021.

9  Q.   And what branch?

10 A.   Army reserves.

11 Q.   So, you were reserves, not active?

12 A.   Correct, but I got activated.

13 Q.   When was that?

14 A.   I believe -- well, I did my initial

15 in -- I think I did training in 2016,

16 and that was about four to six months.

17 I got activated in 2017 for six months,

18 and then I did a year in 2018 to 2019, I

19 believe.

20 Q.   Okay.  And what was your assignment

21 in the reserves?

22 A.   Intelligence analyst.

23 Q.   Okay.  And did you have any

24 specific -- well, I know you went to

25 basic.  Did you have any additional

KENNETH EVERETT

Page 23

1   Q.   Okay.  So, you were a witness in

2   that, not a subject?  The only --

3   **A.   Right.**

4   Q.   -- Internal Affairs investigation

5   you were subject to was the motorcycle?

6   **A.   Correct.**

7   Q.   All right.  And outside of that,

8   are you aware of any allegations of

9   misconduct of any kind that were brought

10  against you during your time at St.

11  Johns?

12  **A.   I had this incident that we're here**

13  **for today.**

14  Q.   Okay.

15  **A.   I don't think -- I might have**

16  **misunderstood the question, but I**

17  **didn't -- I don't think it resulted in**

18  **IA.  But I was disciplined for it.**

19  Q.   Okay.  And what was the discipline

20  that you received?

21  **A.   A consultation form by Sergeant**

22  **Andy Thornton and --**

23  Q.   Okay.  And can you explain what a

24  consultation form is?

25  **A.   It's just like getting written up.**

KENNETH EVERETT

Page 24

1   Q.    Okay.   So, when you get written up,

2   is there a specific, I guess, person you

3   have to speak with, or is there a

4   specific person that does these forms

5   that you have to speak to?   And what is

6   the process that you have to go through

7   for these forms?

8   **A.    My immediate supervisor is the one**

9   **that issues it and writes me up**

10  **essentially.   I'd have to check the**

11  **sheriff's office SOP on the scale of how**

12  **many write-ups count as, you know, a**

13  **suspension, but if you were to get a**

14  **certain amount of write-ups, you would**

15  **get suspended.   And if it were to keep**

16  **occurring, then you would get**

17  **terminated.**

18  Q.    Okay --

19  **A.    And there's also levels to it.**

20  **Like I said, I don't know the SOP for**

21  **it, the standard operating procedures**

22  **for the levels right now, so...**

23  Q.    Okay.   That's fine.

24        And have you ever been offered the

25  services by the St. Johns County

Exhibit 2

KENNETH EVERETT

Page 28

1   Q.   Was there -- so, for this case, was

2   there an arrest warrant issued prior to

3   the interaction?

4            MS. ADKINS:  Object to

5        form.

6            THE WITNESS:  Prior to the

7        interaction?  No.

8   BY MS. WOMBLE:

9   Q.   Okay.  Did you have an arrest

10  warrant that authorized you to enter his

11  home?

12  A.   No.

13  Q.   Okay.  And you do have independent

14  recollection of this case, facts that

15  you know, not that someone else told

16  you, correct?

17  A.   Correct.

18  Q.   Okay.  Okay.  So, let's refer back

19  to the date of the incident July 29th,

20  2019.  Were you on duty that day?

21  A.   Correct.

22  Q.   Okay.  And were you in uniform?

23  A.   Yes, ma'am.

24  Q.   And what was your assignment on

25  that day?

Exhibit 2

KENNETH EVERETT

Page 31

1   **A.   I might have answered twice.  I'm**
2   **not sure.**
3   Q.   Okay.  Now, is that customary, for
4   an officer who's there to take a
5   statement to answer the alleged victim's
6   phone?
7   **A.   Is it customary?**
8   Q.   Yeah.  Or was it in policy?
9   **A.   I don't know of any policy against**
10  **it.  What do you mean by customary,**
11  **though?  Is it normal procedure?**
12  Q.   Is it normal procedure, yes.
13  **A.   From what I've seen, yes.**
14  Q.   Okay.  And you said you're not sure
15  of any policy against it?
16  **A.   No.**
17  Q.   And on the day in question, when
18  you arrived to Mr. Harrison's residence,
19  were you in a marked or unmarked patrol
20  car?
21  **A.   I was in a marked vehicle.**
22  Q.   Okay.  And did you have a partner
23  on this day, on this occasion?
24  **A.   I did not have a partner riding**
25  **with me, no.**

KENNETH EVERETT

Page 32

1  Q.   Okay.  And the officer that -- who
2  was the officer that came to help you on
3  this call?
4  A.   Deputy Warwin.
5  Q.   Okay.  And did you make the initial
6  contact with Deputy Warwin to ask him to
7  assist?
8  A.   Did I make the contact -- did I ask
9  him to help?
10  Q.   Yeah.  Did you ask him to help
11  you?
12  A.   Yes.  Yeah.
13  Q.   Okay.  And what is the policy when
14  requesting assistance for a call?
15  A.   We had visually seen each other
16  prior to this interaction, and we were
17  at briefing at the sheriff's office.  I
18  talked to my supervisor about going to
19  Ms. Harrison's house to interview him or
20  his apartment to interview him.  And
21  then I believe he said something like,
22  you know, "Take Keegan with you," Keegan
23  being Warwin, Deputy Warwin.
24  Q.   Okay.  And when you called Deputy
25  Warwin, what did you tell him the call

KENNETH EVERETT

Page 34

1    A.    With traffic, it's about five to

2    ten minutes.  It depends.

3    Q.    Okay.  And when you arrived at Mr.

4    Harrison's apartment, what was he doing,

5    or where did you first encounter him?

6    A.    I backed into a parking spot, and I

7    was walking up to his apartment.  He

8    lived on the second floor, and he was

9    walking down the stairs, saw me, turned

10   around and went back upstairs.  And I

11   said for him to come here, and he

12   retreated back to his apartment.

13   Q.    Okay.  And after he retreated back

14   into his apartment, could you please

15   describe the events that took place

16   after that?

17   A.    We went to the door to interview

18   him, and I was knocking on the door.  I

19   don't remember exactly what was said.  I

20   remember him cracking the door open, and

21   I remember feeling uncomfortable because

22   I couldn't see his hands.

23        And he is a suspect in this case,

24   and, also, he had just retreated from

25   me, so I didn't know what his intentions

KENNETH EVERETT

Page 35

1    were.  So, him running away and me not

2    seeing his full body made me very

3    nervous.  And he said that he would talk

4    to me, and then I believe he didn't talk

5    about the case.

6         Like I said, I don't remember

7    exactly what was said.  And then he did

8    show me his hands, but then he put them

9    back in the door so I could only see

10   probably about two to three inches in

11   the cracked door.

12        Do you want me to continue?

13   Q.   Yes, you can.  Yes.

14   A.   Okay.  So, I looked back at Deputy

15   Warwin and told him that we were about

16   to enter.  I pushed the door open and

17   tried to grab him, but he retreated back

18   further into the apartment, which we

19   followed and then placed him in

20   handcuffs.

21   Q.   Okay.  And prior to entering his

22   apartment, did you announce yourself?

23   A.   I believe so.  I don't remember.

24   Q.   Okay.  And did you tell him the

25   reason that you were there?

KENNETH EVERETT

Page 36

1   **A.    I'm sure I would have.  I don't**
2   **remember exactly what was said.**
3   Q.    Okay.  And at any point in time
4   while the door was cracked, was he
5   aggressive?  What was his demeanor?
6   **A.    He sounded like he didn't want to**
7   **talk to me, and -- I don't remember, and**
8   **it's hard to tell somebody's demeanor**
9   **through a cracked door.**
10  Q.    Okay.  But at any time behind door,
11  was he at all aggressive?
12  **A.    What do you mean by that?**
13  Q.    You said he made you nervous, so
14  I'm trying to articulate what about his
15  demeanor made you nervous?
16  **A.    In my mind, he would know that he's**
17  **a suspect in this case because he kept**
18  **calling his girlfriend or ex-girlfriend**
19  **while I was there while I'm telling him**
20  **that I'm a deputy sheriff, and he**
21  **continues to call.**
22  **       Well, then he sees law enforcement**
23  **as he's walking down the steps, retreats**
24  **back into his apartment and then is not**
25  **showing his hands, and not coming**

Exhibit 2

KENNETH EVERETT

Page 37

1   outside, which would make me nervous.

2   Q.    Okay.   And at any point in time,

3   was he considered an armed and dangerous

4   suspect?

5   A.    I didn't -- I didn't know if he was

6   armed or not.

7   Q.    Okay.   And during this time that

8   you were standing outside of the door,

9   you said he showed you his hands.   When

10  he showed his hands, was it a clear

11  view?

12  A.    Yes.   I believe he put his hands

13  out, then he put them back in.

14  Q.    Like, put them completely outside

15  the door or --

16  A.    Correct.

17  Q.    -- out in front of him?   Okay.

18  A.    The door's still cracked, and his

19  whole entire body is inside the

20  apartment.

21  Q.    Okay.   And before you entered the

22  apartment -- so, before you entered, it

23  was cracked, and you said he retreated.

24  Who widened the space of the door to

25  enter?   Who broke the plane?

KENNETH EVERETT

Page 40

1        know, nothing to jeopardize their
2        safety.  Also, I'd defer back to
3        the SOP for that.
4   BY MS. WOMBLE:
5   Q.    Okay.  That's fine.
6        And in this case, what signs gave
7   you the indication that this case met
8   one or more of the exceptions to enter
9   the home to execute an arrest without a
10  warrant?
11  **A.    Sorry.  Can you repeat that?**
12  Q.    Yes.
13        I said what signs gave you the
14  indication that this case met one or
15  more of those exceptions that you
16  mentioned?
17            MS. ADKINS:  Objection to
18        form.
19            THE WITNESS:  At the time
20        my nervousness got the best of me
21        because I couldn't see his hands,
22        and he was acting odd.  Nothing
23        legally speaking permitted me to
24        enter the door.  I made a mistake
25        on that day.

KENNETH EVERETT

Page 45

1    ex-girlfriend or boyfriend, that you
2    need to interview them in a certain
3    way.  I don't know of a policy like
4    that.
5    Q.   Okay.  And how soon after you
6    entered the apartment did you place Mr.
7    Harrison in handcuffs?
8    A.   I believe, you know, five --
9    approximately five to ten seconds.
10   Q.   Okay.  And what was your intention
11   when you placed him in handcuffs?
12   A.   To arrest him.
13   Q.   And what gave you probable cause to
14   arrest him?
15   A.   The insistent communication
16   unwanted, communication with his
17   girlfriend.
18   Q.   Okay.  And is the stalking a type
19   of incident that would allow you to
20   initiate that arrest without a warrant?
21   A.   For the arrest itself, yes.
22   Q.   Okay.  And what is the policy on
23   that?
24   A.   It's part of the legal guidelines
25   of a warrantless arrest.

KENNETH EVERETT

Page 46

1    Q.   Okay.  And can you state what those

2    guidelines are?

3    A.   I cannot state all the legal

4    guidelines.

5    Q.   Do you know any of them?

6    A.   You're asking me to name

7    warrantless arrests?

8    Q.   Yes.  Do you know any of the

9    guidelines for a warrantless arrest?

10   A.   Right.  Yes.

11        Stalking, 316 and 322, the driving

12   offences, criminal driving offences,

13   trespassing, any felony -- sorry,

14   trespassing in a business.  Domestic

15   violence, battery, transit fare evasion,

16   and there's multiple of them.  I don't

17   know all of them right now.

18   Q.   Okay.  And when you arrested Mr.

19   Harrison or when you placed him in the

20   handcuffs, what transpired next?

21   A.   We took him out of his apartment

22   and walked him downstairs, and placed

23   him into my patrol vehicle.

24   Q.   Okay.  And when you placed him in

25   the back of the patrol vehicle, were the

KENNETH EVERETT

Page 47

1   windows down or up?

2   **A.    They were up.**

3   Q.    Okay.  And at the time that you

4   placed him in the back of the patrol

5   vehicle, was the car on or off?

6   **A.    It was on.**

7   Q.    It was on?

8   **A.    It was on.**

9   Q.    Okay.  So, with the car being on,

10  was the air conditioner on?

11  **A.    It was.**

12  Q.    Okay.  And when you placed him in

13  the back of the vehicle, how long was he

14  detained?

15  **A.    I'd have to check the call log, the**

16  **CAD notes.  Approximately 30 minutes, to**

17  **my knowledge.**

18  Q.    Okay.  And in that 30 minutes, what

19  transpired?  Did you make a call to a

20  supervisor?

21  **A.    I did.**

22  Q.    Okay.  And what did that call

23  involve?

24  **A.    I called my sergeant and said,**

25  **"Hey.  We arrested Mr. Harrison."  And**

KENNETH EVERETT

Page 48

1    it's routine that we notify our
2    supervisor when placing somebody under
3    arrest.  He asked -- or I told him how
4    it was executed.
5         He told me, "I think you're good,
6    but let me check with my supervisor,"
7    the lieutenant.  And minutes went by,
8    and he calls back and tells me that --
9    to not place him under arrest.
10   Q.   Okay.  And did the supervisor ever
11   come to the scene?
12   A.   I believe he did.  I don't
13   remember.
14   Q.   Okay.  And was there a reason why
15   they said to not place him under
16   arrest?
17   A.   Because of the entrance into the --
18   the warrantless entrance into the
19   apartment.
20   Q.   Okay.  How soon after that phone
21   call did you release Mr. Harrison?
22   A.   After the initial phone call?
23   Q.   After the -- I guess after the
24   supervisor said to let him go, how long
25   after that did you release him, or how

KENNETH EVERETT

Page 49

1    soon?  Excuse me.

2    A.    I would say approximately 25 to 30

3    minutes.

4    Q.    Okay.  And is it standard policy

5    and procedure to continue to hold

6    someone for that long after a supervisor

7    has said let them go?

8    A.    Oh.  I'm sorry.  I think I

9    misunderstood.  I thought you meant my

10   first initial phone call with him.

11   You're asking me the second phone call

12   where he said to let him go?

13   Q.    Yes.  Correct.  The second phone

14   call where he said let him go.

15   A.    The second phone call when he

16   called me back and said, "Hey.  Release

17   him," I released him immediately after

18   that phone call.  Is that what you

19   mean?

20   Q.    Yes.  Yes.

21   A.    Okay.  Yeah, yeah, yeah.  I didn't

22   hold him for 25 to 30 minutes after he

23   called me, no.  Sorry.

24   Q.    Okay.  No.  You're fine.

25         So, back to the initial detainment

Exhibit 2

KENNETH EVERETT

Page 52

1    free to go.  But if I pull you over and
2    put you in handcuffs and put you in the
3    back of my car, you're arrested.
4    Q.    Okay.  And I want to ask a couple
5    of questions.  Jumping around a little
6    bit, but back to the apartment.  At the
7    time when you entered the apartment, was
8    there a camera visible?
9    A.    I believe on his phone or
10   something.
11   Q.    Okay.  And what happened to that
12   camera?  Did it get knocked over in the
13   course of his arrest?
14         MS. ADKINS:  Objection
15   form.
16         THE WITNESS:  Did his phone
17   get knocked over?
18   BY MS. WOMBLE:
19   Q.    Correct.
20   A.    No.  I think his phone was in his
21   hand.
22   Q.    Okay.  And was that the only thing
23   recording the encounter?
24   A.    I don't know.
25   Q.    Did you have body cams?

Exhibit 2

KENNETH EVERETT

Page 53

1  **A.    No.**

2  Q.    Okay.  Do you all have body cams at

3  all?

4  **A.    At the time, no.**

5  Q.    Okay.  And are you aware of the

6  video in this case?  Are you aware of

7  the video of the cell phone recording?

8  **A.    Yes.**

9  Q.    Okay.  And do you know who stopped

10  the video, who stopped the recording?

11  **A.    I believe it would have been me if**

12  **I did stop it.  So, when somebody's**

13  **arrested and we have to -- it's policy**

14  **to search their person, I'm not going to**

15  **put somebody in the back of my car**

16  **without being searched first.**

17  **The policy is to take all of their**

18  **possessions in their pockets and on**

19  **their person, and confiscate them and**

20  **have them placed in our car away from**

21  **their immediate area.**

22  Q.    Okay.  Okay.  I think I am done

23  with my questioning.  Do you feel like

24  you had adequate opportunity to answer

25  all the questions how you want to answer