UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

- - -

BRYAN A. HARRISON            : CASE NO.
                             : 3:21-CV-746-BJD-JRK
        Plaintiff,           :
                             :
        V.                   : NO. 20-5928
                             :
ST. JOHNS COUNTY             :
SHERIFF'S OFFICE, ET AL.:
                             :
        Defendants.   :

- - -

Monday, October 17, 2022

- - -

        Oral deposition of PATRICK WARWIN,
taken via Zoom Video Communications on the
above date, beginning at approximately
9:10 a.m., before Maria Rousakis,
Professional Court Reporter and Notary
Public.

- - -

DiPIERO COURT REPORTING
Registered Professional Reporters
1175 Marlkress Road – Unit 2460
Cherry Hill, New Jersey  08034
(215) 735-8101

Exhibit 3

PATRICK WARREN

Page 11

1   A.    I don't have an exact date.  I'd

2   say maybe two years.

3   Q.    Okay.  And initially, prior to

4   becoming a police officer, when did you

5   begin your training?  Do you remember

6   the year and date?

7   A.    Like, the academy, or when did I

8   do --

9   Q.    The academy.

10  A.    -- training for the sheriff's

11  office?

12  Q.    The academy.

13  A.    I believe it was July of 2017.

14  Q.    Okay.  And when did your training

15  begin for the sheriff's office, after

16  the academy or about the same time?

17  A.    After the academy 'cause I got

18  hired in March of 2018, so then we had

19  two months of classroom training and

20  two months of FTO training.

21  Q.    Okay.  Thank you.

22        And, then, since the completion of

23  your -- of the police academy and your

24  initial training with the sheriff's

25  office, have you completed any other

Exhibit 3

PATRICK WARREN

Page 12

1    trainings special or specific to your

2    units?

3    A.      I've taken a field training class,

4    radar laser.   That's it.   That's all I

5    can think of.

6    Q.    Okay.  And do you know specifically

7    when you took these trainings and

8    classes?

9    A.    I don't.

10   Q.    Approximately, do you remember the

11   year?  Was it this year, last year?

12   A.    I don't know.

13   Q.    Okay.

14   A.    Before I got on the field training

15   team, so I don't know if that was --

16   whenever I got on that or before, so I

17   don't know.

18   Q.    Okay.  That's fine.

19        And, then, have you attended any

20   conferences, either mandated or

21   personal, for your position?

22   A.    No.

23   Q.    Okay.  And let's see.  Okay.  For

24   the marine unit, who is your immediate

25   supervisor?

Exhibit 3

PATRICK WARREN

Page 13

1    A.    The Corporal, Aaron Braddock.

2    Q.    And for the field training officer,

3    who is your immediate supervisor?  Is it

4    the same individual or different?

5    A.    No.  I didn't have a supervisor for

6    the training, but we have a sergeant

7    over the team, Zach Cook.

8    Q.    Okay.  And on the date in

9    question, were both of these

10   individuals your immediate supervisor at

11   the time?

12   A.    No.

13   Q.    Who was your immediate supervisor

14   at the time of the incident in

15   question?

16   A.    My immediate supervisor was David

17   Blanton.

18   Q.    Okay.  And do you have a partner?

19   A.    We are not assigned partners.  We

20   have people that we work with in the

21   same area of assignment, but we don't

22   have partners that ride in the same car

23   with us.

24   Q.    Okay.  And have you ever been

25   disciplined or had any complaints

Exhibit 3

PATRICK WARREN

Page 19

1    recollection of what happened that day,

2    not you hearing it from someone else.

3    **A.    I do.**

4    Q.    Okay.  So, let me refer you back to

5    the date of the incident of July 29th,

6    2019.  Were you on duty that day?

7    **A.    I'm assuming so because that's --**

8    **if that's the day that it happened,**

9    **yes.**

10   Q.    Okay.  And were you in uniform?

11   **A.    Yes.**

12   Q.    And what was your assignment that

13   day?

14   **A.    Patrol.**

15   Q.    Okay.  And were you in a marked

16   patrol car or unmarked?

17   **A.    A marked.**

18   Q.    You said "unmarked?"

19   **A.    No.  Marked.**

20   Q.    Marked, okay.

21        And on this day, did you have -- I

22   know you said you don't have partners,

23   but did you have someone assigned to

24   the same area of patrol with you this

25   day?

Exhibit 3

PATRICK WARREN

Page 20

1    A.    If you're referring to Kenny, he

2    was not assigned to the same area that I

3    work.    He works in a completely separate

4    portion of the county.

5    Q.    Okay.   And who's Kenny?   What is

6    his full name?

7    A.    Kenny Everett.

8    Q.    Okay.   And prior to this day, had

9    you had any contact with Bryan Harrison

10   before?

11   A.    No.

12   Q.    Okay.   And looking back to the

13   incident on July 29th, 2019, can you

14   walk me through your recollection of the

15   events that transpired?

16   A.    We had briefing that day before

17   nightshift at 5:00 p.m. to 5:00 a.m.

18   Kenny approached me.   Deputy Everett

19   approached me and asked if I would

20   assist him in speaking with a suspect he

21   had in a stalking case.   I agreed.

22        We went to an apartment complex

23   which is in St. Augustine's Police

24   Department's jurisdiction, which is

25   nearest to my area of assignment that

PATRICK WARREN

Page 21

1    day.   When we arrived to the apartment

2    complex, Deputy Everett pointed out that

3    the individual was coming down the

4    stairs.

5          I don't know if you can hear the

6    helicopter in the background, so I'll

7    just wait a second.   It was loud.

8          Okay.   When we got to the apartment

9    complex, Bryan Harrison was coming down

10   the stairs of his apartment complex

11   virtually as we were walking up the

12   stairs.   He saw us, turned around and

13   went back into his apartment as we

14   proceeded up the stairs.

15          I stood somewhere near the stairs

16   once we were on the second floor, and

17   Deputy Everett knocked on the door.   And

18   that's when Bryan Harrison cracked the

19   door open to speak with Deputy Everett.

20   They exchanged some words.   I don't know

21   what was said.   I don't remember what

22   was said.

23          Deputy Everett kept looking back

24   towards me.   I don't remember why or

25   what we said to each other, or if

Exhibit 3

PATRICK WARREN

Page 22

1   anything was said to each other.  A few
2   minutes goes by of conversation with
3   Bryan and Deputy Everett.  That's when
4   Deputy Everett begins to push the door
5   open, and that's when I went in as well
6   because I'm not going to leave him
7   hanging.
8        And we went inside the apartment,
9   placed Mr. Harrison in handcuffs and
10  brought him outside of the apartment.  I
11  believe Deputy Everett had main control
12  of the individual, which was Mr.
13  Harrison, walked him down the stairs,
14  out to a patrol vehicle, which would
15  have been Deputy Everett's patrol
16  vehicle, placed him in the back, and
17  Deputy Everett made a phone call to his
18  supervisor to let him know what was
19  going on.
20  Q.   Okay.  And where did you say you
21  were standing during these
22  conversations?  What proximity to the
23  Deputy Everett and Bryan Harrison?
24  A.   Are you talking about distance,
25  north, south, east, west?

Exhibit 3

PATRICK WARREN

Page 24

1          MS. ADKINS:  Objection to

2     the form.

3          MS. WOMBLE:  Repeat that

4     one more time?

5          MS. ADKINS:  I just

6     objected to the form.  He may

7     answer the question.

8          MS. WOMBLE:  I can rephrase

9     it.

10   BY MS. WOMBLE:

11   Q.    So, what special training or what

12   are you all given to teach you how to

13   enter apartments?

14   A.    **We're trained all throughout the**

15   **academy and during training, and every**

16   **year we have refresher trainings.**

17   Q.    Can you describe or can you tell me

18   what that training is?

19   A.    **I can't describe it.**

20   Q.    So, what parameters are you given

21   to enter apartments?  Do they tell you

22   when to enter, when not to enter, how

23   to approach a suspect in these

24   trainings?

25   A.    **I mean, they give you guidance, but**

Exhibit 3

PATRICK WARREN

Page 25

1    **they can't tell us ultimately how to do**

2    **our job.   It's all situational based,**

3    **like situational.**

4    Q.   Okay.  And were there extended

5    circumstances in this case for you all

6    to enter without a warrant?

7    **A.    I don't -- I don't know.**

8    Q.   Okay.  So, Deputy Everett answered,

9    and then you followed.  But you said you

10   did not hear the conversation, or you

11   didn't hear anything that gave consent

12   to enter and don't know if there's

13   extended circumstances?

14   **A.    I don't remember the conversation**

15   **that was said.  This happened almost**

16   **four years ago, three years ago.  I**

17   **don't know exactly what was said, so I'm**

18   **not going to say what I don't know was**

19   **said.**

20   Q.   Okay.  And what is the standard

21   protocol that officers, you know, from

22   your -- from the St. Johns County

23   Office -- what standard protocols are

24   you all supposed to use when executing

25   an arrest?

Exhibit 3

PATRICK WARREN

Page 28

1    A.    Extended circumstances.

2    Q.    Do you know those specific

3    circumstances?  That's my question.

4    A.    I do.

5    Q.    What are those circumstances?

6    A.    Threat to public safety or

7    ourselves, destruction of evidence.

8    Q.    Okay.  On that day, on July 29th,

9    was there anyone else in the vicinity at

10   the time that you and Deputy Everett

11   were speaking to Mr. Harrison?  Was

12   there anyone else within close proximity

13   that was outside or watching or near the

14   apartment?

15   A.    I don't recall.

16   Q.    And at any point in time, did you

17   all feel that Mr. Harrison -- was he

18   armed?  Was he dangerous?  Was he a

19   threat to your safety?

20   A.    I don't know.  He only had the door

21   cracked.  I could only really see his

22   face, so...

23   Q.    So, the door was cracked.  It

24   wasn't fully open.  Was he aggressive at

25   any point in time while the door was

DiPIERO COURT REPORTING
(215) 735-8101
Exhibit 3

PATRICK WARREN

Page 31

1   A.    I do not believe so, but I don't

2   know for sure.

3   Q.    Okay.  And you said that prior to

4   going on this call, Deputy Everett

5   called you to ask you to accompany him

6   to question this witness.  Did he give

7   you any details on what this was about,

8   or did he just tell you it was

9   stalking?

10  A.    He said he had probable cause to

11  arrest Mr. Harrison for the charge of

12  stalking.

13  Q.    Okay.  And he did not tell you

14  whether there was a warrant or

15  anything?

16  A.    No.

17  Q.    Okay.  And let's see.  So, were you

18  disciplined for the actions in this case

19  in any way?

20  A.    I was.

21  Q.    And what was that discipline?

22  A.    Written consultation, I believe.  I

23  don't know the exact words for what they

24  call that.

25  Q.    Okay.  And were you required to

PATRICK WARREN

Page 34

1    **A.    Yes.   It should have been.   It**
2    **wasn't my car, so I can't say**
3    **100 percent, but it's not customary for**
4    **us to put individuals in the back of our**
5    **patrol cars with the air off in the**
6    **middle of the summer with the windows**
7    **up.**
8    Q.    I know it was the middle of
9    summer.  What time of day did this
10   arrest take place, or detainment take
11   place?
12   **A.    Shortly after 5:00 p.m.**
13   Q.    Okay.  And what was the weather
14   like that day?
15   **A.    I don't know.**
16   Q.    You said you don't know?
17   **A.    No, I don't remember.**
18   Q.    Okay.  Was it sunny?  Was it
19   raining at all?
20   **A.    It wasn't raining.  I know that.**
21   Q.    Okay.  And would you agree that
22   with the windows rolled up, that
23   sitting in a patrol car in the middle
24   of the summer, it can heat up very
25   quickly?

PATRICK WARREN

Page 41

1    **being or was about to be committed.**

2    Q.   Okay.  And what facts or evidence

3    did you have that this was the case?

4    **A.   You'd have to ask Deputy Everett**

5    **that.  I was just a backup unit for him.**

6    **I didn't have any information on the**

7    **case.**

8    Q.   So, you knew nothing about this

9    call, just essentially what he told

10   you?

11   **A.   He said, "I have probable cause to**

12   **arrest Mr. Harrison for the charge of**

13   **stalking.  Can you back me up?"**

14   Q.   Okay.

15   **A.   I didn't know the details about**

16   **what happened.**

17   Q.   Okay.  And you said that Mr.

18   Harrison was in the back of the car for

19   approximately 30 minutes.  Can you

20   explain why it was reasonable to hold

21   him in the car for that length of time?

22           MS. ADKINS:  Object to the

23       form.

24           THE WITNESS:  I believe we

25       were waiting on a callback from a

PATRICK WARREN

Page 42

1          supervisor.  It's customary to,

2          once we place somebody in

3          handcuffs, call our supervisor

4          and tell them what we had, and I

5          believe we were waiting on a

6          callback from Deputy Everett's

7          supervisor.

8     BY MS. WOMBLE:

9     Q.    Okay.

10    **A.    And, again, 30 minutes is a rough**

11    **estimate.  I do not know the exact**

12    **time.**

13    Q.    Okay.  And after you received the

14    callback, were the instructions to just

15    let him go?

16    **A.    I believe Deputy Everett's**

17    **supervisor showed up on scene, and, yes,**

18    **we ended up leaving and letting him go**

19    **back up to his apartment.**

20    Q.    Okay.  And there was a camera.  Are

21    you aware of the camera --

22    **A.    I am.**

23    Q.    -- on the date of this incident?

24          Okay.  And what happened to that

25    camera?  How did it get knocked over?

Exhibit 3

PATRICK WARREN

Page 43

1          MS. ADKINS:  Object to

2      form.

3          THE WITNESS:  I don't

4      believe it did get knocked over.

5  BY MS. WOMBLE:

6  Q.   Okay.  So, the camera, you know,

7  was on the entire time?

8  A.    Until we exited the apartment.

9  Q.   Okay.

10 A.    It might have been shut off by -- I

11 don't know who had the camera.  Could

12 have been Deputy Everett, could have

13 been me.  I can't tell you who had it,

14 but it was probably shut off if the

15 video didn't continue.

16 Q.   Okay.  Okay.  So, you all shut

17 the -- at what point was the camera --

18 A.    I didn't say that.

19 Q.   Okay.  Could you please let me

20 finish the question?

21 A.    Mm-hmm.

22 Q.   At what point was the video

23 stopped?  Do you remember at what point

24 of the interaction the video was

25 stopped; do you remember?

Exhibit 3

PATRICK WARREN

Page 44

1    A.    I do not.

2    Q.    Okay.  So, when the video stopped,

3    was he already out of the apartment; was

4    he in the car; you don't know?

5              MS. ADKINS:  Object to

6         form.

7              THE WITNESS:  I don't know

8         'cause I don't know when it was

9         stopped, so I don't know where we

10        were.

11   BY MS. WOMBLE:

12   Q.    Okay.  And are you aware of the

13   individual who made the stalking

14   complaint?  Do you know who that is?

15   A.    No.

16   Q.    You've had no prior or subsequent

17   contact with them?

18   A.    I don't even know what her name is,

19   so I couldn't even say yes or no.

20   Q.    Okay.  And Mr. Harrison, you had no

21   subsequent contact with him after this

22   incident?

23   A.    No.

24   Q.    And no prior -- you knew nothing of

25   him prior to this incident?

1    A.    No.

2    Q.    All right.  One second here.

3          Circling back to the supervisor

4    arriving at the scene, do you remember

5    what happened when the supervisor came,

6    what the interaction was?

7    A.    Between who?

8    Q.    The supervisor and yourself and

9    Deputy Everett, and then the supervisor

10   and Mr. Harrison?

11   A.    I do not remember.

12   Q.    Any of the interactions?

13   A.    I don't.  I don't recall the

14   interactions, no.  I don't know.

15   Q.    Okay.  And what was this direct

16   supervisor's name?

17   A.    It could have been Sergeant Andy

18   Thornton.

19   Q.    Okay.  And Sergeant Thornton, he's

20   with the St. Johns County Sheriff's

21   Office as well?

22   A.    He is.

23   Q.    Is he with a specific unit?

24   A.    I don't know.  He was on patrol

25   that day.